attorneys on the People v. Johnson approach. Identify yourselves for the record. My name is Christopher Kopasz and I represent Robin Johnson. Good morning, your honors. Assistant State's Attorney Sheila O'Grady-Kroniak on behalf of the people of the state of Illinois. All right. And Mr. Kopasz, how many minutes do you want to reserve for rebuttal? Maybe three or four minutes. Okay, so it will be 15 minutes each side, so your first argument will be 12 minutes. All right. Thank you. Thank you, Mr. Kopasz. You can proceed. May it please the Court, as I said, I represent Robin Johnson, the defendant in this case. In our brief, we raise a number of issues. Today, I'd like to focus on Issue 1 in the brief, but I, of course, welcome questions on the remaining issues as well. As for Issue 1, this case is about the fundamental right to present a defense in the trial court's evidence that at the time of the alleged crimes, Robin Johnson was suffering from the severe effects of an epileptic seizure. The Chief Epileptologist at Northwestern Hospital, Dr. Steven Shul, testified at a pretrial hearing that after viewing surveillance video of the incident, reviewing thousands of pages of medical records, as well as the police reports in this case, in his medical opinion, Robin was in a prolonged post-ictal psychosis as part of a cluster of epileptic seizures that she had recently suffered. And according to Dr. Shul, in his medical opinion, to a reasonable degree of medical certainty, Robin's condition left her unable to, and I quote, understand the actions around her or to be able to respond to them with any specific intention. Does that sound like maybe a new version of the insanity defense? No, not at all. No? Don't you think it sort of aligns with some of what's in the requirements to meet the test? The current insanity test? Yes. The one that was in place when she was on trial. Right. So that one deals, the insanity as we currently define in Illinois, deals with your ability to appreciate the criminality of your act. Based on what? Based on some sort of mental defect, whether you know the difference between right or wrong. What we're talking about here is a complete inability to understand what's going on around her. An inability to do intentional or purposeful behavior. Her actions were not self-generated, according to the expert. The trial court also, I believe, stated that they watched the video 12 times. Is that correct? Yes. So the trial court did an extensive evaluation of exactly what the doctor looked at in determining this post-psychotic episode or whatever it was, correct? Mm-hmm. So isn't it incumbent on the trial court to look at all those things and determine whether this is relevant evidence or not, or whether it's just going to be throwing something at the wall and seeing what happens? I would certainly not describe this as throwing something at the wall. Dr. Shul's opinion was based on more than just the video. It was based on... But if the video contradicts what the doctor had said to him, wouldn't that make a difference in whether the trial judge was correct or not? The video does not contradict what Dr. Shul said. I guess that's where the argument is. His view of the video is that she's acting in a very odd, erratic manner, consistent with a post-ictal epileptic seizure. Thank you. I didn't know how to say that. I'm sorry. Go ahead. Did he opine that she suffered from epilepsy at any point in his testimony? No. He was unable to diagnose her with epilepsy. That said, he was adamant, firm and clear, that an epileptic seizure is not... The diagnosis of epilepsy wasn't important to his decision because an epileptic seizure would present in the same way. And he couldn't tell the basis of her seizures, whether they were provoked or unprovoked, and so he couldn't make that official diagnosis of epilepsy. Would he need to in order to come under the Voluntary Act doctrine? Not at all. No. The diagnosis of epilepsy is unimportant where the epileptic seizures will occur in the same way. Well, did he say he couldn't say whether she was having an epileptic seizure? No. He was clear that she was in the post-ictal phase of an epileptic seizure. Of a seizure. Of an epileptic seizure. Correct. But he couldn't diagnose her with epilepsy, but somehow she had... Isn't that kind of the cart before the horse? No. Not at all. I mean, that's the point of having this expert testimony. I mean, I didn't know this before reading this record. I'm sure lots of people don't realize that you can have an epileptic seizure without a diagnosis of epilepsy, which is defined as two or more unprovoked epileptic seizures. And so, having not been able to tell through EEGs that he had done, and through his medical history, what exactly was causing them, whether these were provoked or unprovoked... Would it matter legally under Illinois law if the seizure was provoked? No. What case would you cite that says a provoked seizure would amount to an involuntary act? There's no case either way on provoked or unprovoked seizures. What the Illinois Supreme Court has said is that if you are acting involuntarily, such as acting during a seizure, that removes you from criminal liability. And what case do you rely on for that? That comes all the way from Grant. The 71 Illinois Second. The 71 Illinois Supreme Court case, I believe. What about his opinion where he was asked if she was acting voluntarily? And what he said basically was, well, you know, you could tell that yourself. You can decide whether she's acting erratically at one point, and whether she's acting voluntarily at another point by her actions. For example, I think he referred to her pointing a gun at someone and ducking down and firing a gun in the direction of police officers. Didn't he say those were voluntary acts? He did not. Did he say that someone looking at them or hearing about it could make that determination? They didn't need to be an expert. What he said, and I think it's really, really important to clarify this point, what he said during his cross-examination by the prosecution, the prosecution asks him if a number of acts are, quote, volitional. So that's a term that the state has brought up, and asks whether her, you know, getting on and off the bus, all those sorts of things are, quote, volitional. And at some point, the doctor says, wait a second, I think we have a different definition of volitional here. And he says volitional, for me, movements are volitional. So any step, holding something, pulling a trigger are volitional acts. So what he's really talking about are, you know, motor movements, you know, the ability to make motor movements, and that doesn't make it involuntary. I mean, then you would never have the result in... What makes it voluntary? The ability to be able to control it through your conscious mind. The fact that you're able to make motor movements, even seemingly complex ones, doesn't mean that it's voluntary. Yes. Because then you would never have the result in Chilenko, where the defendant somehow escaped from handcuffs and walked to a parking garage. You'd never have the result in Nelson, where a defendant with Tourette's did a number of complex movements, looked up a number in the phone book, dialed the phone number, had a conversation with the person, and yet the appellate court said that those actions were involuntary. What is your understanding of diminished capacity? So, in Illinois, the only case that I'm aware of that addresses this is Hewlett, and it's described as a partial defense that's generally limited to specific intent crimes, and that because your capacity is diminished, so not eliminated, but diminished in some way, you'd be guilty of a lesser mental state. Okay, so it doesn't apply to murder then? No, it can apply to murder, I suppose. The intentional selection. What is your understanding of whether or not Illinois recognizes diminished capacity for a murder charge where the indictment or information says that the person knew or had reason to know their acts created a strong probability of death or great bodily harm? So diminished capacity, as I understand it, in that sense would not be a valid defense in Illinois. So it wouldn't be a defense to any of the sections of 9-1, murder. Specific intent, knowing that your acts create a strong probability of death or great bodily harm. That's correct. Okay, all right. So what you're really saying is that if that evidence, if that expert testimony was allowed, there could be a finding of manslaughter. No, I'm saying, no, not at all. The expert testimony went to voluntariness, the state's burden to prove that the act was voluntary, and it would entirely negate the mental states of intent or knowledge. Those are sort of two... Yeah, but if you want to get there, isn't the normal way to get there is that you plead the defense of insanity and show that this caused her to do something that she had no control of due to the fact that she had this condition? That's not necessary. If you go back to Grant once again... Well, what case says it's not necessary? Grant. If you look at the Illinois Supreme Court case, it says that voluntariness and insanity are two sort of alternative theories that you can use to pursue a defense along these lines. Isn't that the way it's normally done? You plea insanity and then you show that... Well, not at all. ...anaphylactic... I mean, I've seen it... I couldn't tell you how many times. Well, not at all. Because, again, Grant specifically says seizures, acts done during a seizure, are involuntary. So you have that, and then you have the court saying that... You mean all acts done under a seizure are involuntary? Voluntary. Let's go to Peeble v. Jackson for a minute. You said it in your reply brief. I was on that panel. How do you think that supports this case? Because Jackson involved somebody who was having a seizure and who during the seizure pushed a paramedic out of the ambulance during the seizure. That clearly was involuntary movement. So you couldn't establish the mental state. Here, we have somebody who's struggling with a police officer, somehow disarms the police officer, shoots him in the head, and then shoots two other officers. So explain to me how those two scenarios in any way relate to each other. I think they're very closely related. And I would just be part of your description of Jackson. There was no diagnosis of epilepsy in Jackson. But I believe that all the testimony was he was having a fit, right? He was acting irrationally. The court said in its opinion the ultimate diagnosis was irrelevant. I think that's a quote from the decision. What was relevant... I don't like that one. People throw my words back at me. I'm sorry. But what was important was how he was acting, and every single witness described the witness as acting irrationally. The only evidence of epilepsy came, in that case, through the girlfriend who testified that his actions were consistent with what she had seen his previous epileptic seizures. Do you see what I'm saying? The physical movements that he's taking are vastly different than the physical movements in this case. I think in both cases, the officers were trying to restrain a person who was having a mental health crisis of some sort. And that person reacted violently. In this case, there was an officer who grabbed Robin, and she reacted. There was a very brief struggle, and it's not clear how the gun was dislodged, how exactly it was fired, but she clearly reacted violently. Well, the testimony was the officer had his hands up when she shot him in the head. So there's a little bit more mental state going on with the evidence that was presented in the trial court than there ever was in Jackson. I dispute that. There are five witnesses who saw no such hands-up movement. And the point of all of this is... Are there three witnesses who did? There are two witnesses who did see some sort of hands-up movement. I bet it was three. It was Officer Gautier and Jennifer Orza. And one other person? I believe that Gautier and Orza are the only two. Let me just depart here for a minute. There seems to be quite a difference in the interpretation of the evidence in this case. Now, you say that the gunshot residue was inconclusive. Now, the State, in their brief, says that there was testimony supporting particles. Which one is it? I mean, there were particles found. But you say that the gunshot residue tests were inconclusive. And then the State says, in their brief, on page 36, that... Let's see. Maybe it's a different page. They specifically say that there was testimony presented by an expert that indicated that the defendant's hands both had a significant amount of consistent particles present, meaning she either discharged a firearm or was in the environment of a discharged firearm. And then in your brief, you say, on page 16, Johnson's hands were still bloody and both hands were inconclusive for gunshot residue. Now, that's quite a discrepancy in the testimony or interpretation of it, wouldn't you agree? I apologize if that's unclear. My recollection is that there were a small amount of particles found on her and a large number of particles found on Officer Francis's hands. Well, actually, in your brief, you say, Francis's hands had been washed before the test, but his left hand tested positive for gunshot residue. But then you say, Johnson's hands were still bloody and both hands were inconclusive for gunshot residue. Now, in their brief, they say exactly the opposite. So I'm not sure. Is there somewhere in between or is this dichotomy something that I don't quite understand? I'm not quite sure the relevance of this, to be honest. Well, I think it is relevant because you say there's really no one that witnessed the shooting. They say there's multiple witnesses who testified that there was a struggle, that he was trying to pull her away from this other person or kind of get control of her. And there were, according to the state, multiple witnesses who said there was a struggle. Then there was three witnesses who testified that at some point she was holding a gun, he had his hands up near his face, and then a gunshot rang out, and then she was observed firing at other officers. You say no one observed anything. And so there is, I mean, I'm troubled by this complete discussion that seems to be, you know, totally different from the parties here. If I may respond to that. Sure. The discrepancy, I think, is that, what I think needs to be clarified, is that no one saw Robin gain control of the gun and point the gun and fire it at the officer. Well, is there some testimony, though, that three witnesses observed the officer without a gun in his hand, when at the same time she had a gun in her hand, a shot rang out, and he was basically with his hands up, without a gun. Is that at least in the record? That is in the record. For some witnesses, there are five witnesses who see no such movement. And what I think is important as to this, is that Dr. Shul knows this, and maintains, in his medical opinion, that Robin was acting in this post-ictal psychosis, that she was acting with aggression in a reactive state. Let's go to the videotape, too. Now, I viewed it, but is there more than one videotape that we're talking about, or did both sides introduce their own copy of the videotape from the front section of the bus? There's only the one video that I've seen. I think it was played at a couple different speeds, but I think there's only the one. And it is played at different speeds. So on one of the versions, it seems to be sped up, if you will. In other words, there's a person getting on the bus, getting off the bus. Getting on the bus, getting off the bus. That being Robin Johnson, right? And then your version maybe wasn't sped up, but it shows a person getting on the bus, getting off the bus, getting on the bus, getting off the bus. Is that right? Yes. And then, is there really anything else that you can see? There's some description of testimony that you can see some kind of a struggle from that video. Isn't that how you report it in your brief? Yes, you can see the struggle in the background. You can see a struggle? You can see, it's very grainy, but you can certainly see Officer Francis grab her by the arm and... In the video? In the video. And the point is that... Did you say that you could tell she had her arms folded or something? Yes. Where did you say that happened? I believe that's in the video when she's boarding or exiting the bus. Because the court said it looked at the video about 12 times. Right. But you're describing the video as someone being able to see a struggle between two human beings? You can't tell much from the struggle, and that's the point, that the jury should have had the option to view the evidence, the video, the witness testimony. They did view the video, didn't they? Yes, to view the video and the witness testimony. You actually say as an officer of the court that you viewed the video and you believe that there's some way that someone could actually discern what's going on outside, because the video's taken from inside the bus, isn't it? Yes. And you're saying there's evidence of a struggle in the video? Indeed. You can't tell much about the struggle. You do say it's blurry, but before that you say you can tell there's a struggle and he's grabbing her. You can characterize it as a struggle. Exactly what took place during that struggle is not clear, and that is the point of this case. And Dr. Shule's testimony, giving context to this, did not go before the jury. The jury had no opportunity to hear any of this. What about the scientific evidence in this case? There was testimony. Was there not that her DNA was on the trigger of the gun and the handle? Yes. And was there also DNA evidence? I'm not DNA. Expert testimony that this gun had two different safety locks and that it could not fire accidentally. In other words, if you dropped it, it wasn't going to fire. Was that testimony in the record? Yes. So let's assume for purposes of argument that maybe there was an error, only for purposes of argument, in not letting in this testimony. If you have multiple witnesses saying that the officer was unarmed when she fired into his face, that she then, there were two more shots fired into his leg, there was testimony that the only way that this gun could be fired was by actually pulling the trigger, that her DNA was on the handle of the gun. Multiple witnesses testified that they observed him with his hands up when she fired, when the gun was fired. And that she was the only one with a gun. And that subsequently, she fired multiple shots at the officers. And then there was testimony regarding forensics. In other words, there were 20 bullets fired, I think 5 or 6. There was a number that came from the other officer's guns and there was a number that came from the gun that she had her hand on. So would you argue that that's an error that's not harmless? Yes, I would argue that it's an error that's not harmless. Because everything that you just said was a part of Dr. Shule's medical opinion that Robin Johnson was unable to understand what was going on at the time. And her reaction to this was not self-generated. It was a reaction that was someone who was in fear, very irrationally, in fear for her life. Is there any problem, though, with a doctor giving an opinion that seems to be coming under the rubric of insanity that doesn't quite meet the test? I mean, you keep saying that he testified that he was unable to appreciate what she was doing. I mean, isn't that like an attempt to... Why not just go with a straight insanity defense? Again, I mean, one, I wasn't trial counsel. Two, I got her. But also, as I said, insanity deals with your ability to understand right and wrong. There was a volitional prong under the former insanity defense that this might have been more relevant to. That prong is no longer there. And again, if you go back to Grant, the Honor Supreme Court decision on this, Grant acknowledges the relationship between voluntariness and insanity. Voluntariness is a material element of every single offense, regardless of insanity. So, the State was required to prove that this was a voluntary offense. And all we're saying here is that... You're not arguing they didn't prove that. You didn't argue reasonable doubt. No, we're saying that the State, in light of the fact that this was put forth as an issue, this should have gone to the jury, at which point the State would have been required to prove that it was a voluntary act. Most of what we're talking about here, the discrepancy in the evidence, the weight of the expert testimony, these are all questions that are more suited for trial. Here, it meets the minimum standards for expert testimony, for relevance, and this is something that should have gone to the jury. The standard is that the trial court reviews that and decides whether something is relevant, admissible, and then we review it for an abuse of discretion. Well, our argument is the right to present a defense was entirely... Well, how are we reviewing it? You're saying it's a no-no. Because this goes to the entire right to present a defense. The jury heard not a single word about epilepsy, about an epileptic seizure, about a medical condition that so plainly underlies the condition. I thought he couldn't diagnose her with that medical condition. Correct. You're saying they didn't hear about a medical diagnosis, but he didn't make that diagnosis. He didn't diagnose her with epilepsy, he diagnosed her with having epileptic seizures and opined that she was in an epileptic... How could you have an epileptic seizure if you don't have epilepsy? That's exactly what Dr. Shule testified to and should have been able to explain to the jury. Epilepsy has a specific medical definition of requiring two or more unprovoked seizures. That's in his testimony. But he said he couldn't diagnose that in this case. Right. Doesn't he have to have a minimum threshold of evidentiary weight? No. And if you look at Jackson... Doesn't he have to make a diagnosis? Not of epilepsy. If you look at Jackson, again, Jackson is such an important case because Jackson says the exact diagnosis is irrelevant. There was no expert testimony on Jackson. In that case, Mr. Kopecz, I don't think you can take one sentence of an opinion that's very fact-specific and just say, oh, that's a blanket rule for all voluntary actions. But I would say that in that case, the court reversed outright on reasonable doubt grounds even without expert testimony about the epileptic seizure. Here, all we are asking is for the opportunity to present that evidence to get it before the jury and then we can argue about whether there's reasonable doubt or sufficiency of the evidence. And that's why I think Jackson is so important. Thank you, Mr. Kopecz. Do you know how a doctor determines whether a person has epilepsy? Yes. That comes from Dr. Shule's testimony. He can look at the medical history, how people report having the seizure, people who witness the seizure. And it has nothing to do with the brain scan? That is part of it, yes. Isn't that what it's all about, a brain scan? No. In his testimony, he's very clear that you can have a normal EEG, a normal brain scan, and still have epilepsy and still have epileptic seizures. So that does not affect his opinion, in this case, that Robin Johnson was suffering from post-ictal epileptic seizure. He found that the epileptic conditions here were negative. Doesn't that have his words, negative? Epileptic conditions? I'm not sure. He did not find anything to support that. So he found that it was negative as to epilepsy. As to the EEGs, the EEGs that Robin took were normal. He was unable to diagnose her with epilepsy. Did any doctor ever diagnose her with epilepsy? Not that I'm aware of. It doesn't really matter, though. No, I mean, that's the point of having... But what about these cases that describe volitional or voluntary acts? That epilepsy would be something that would fit into that scenario, right? But if you look at Grant, again, Grant says seizures. Grant doesn't say epileptic seizures. Grant doesn't say epilepsy. Grant says seizures. Did the defendant in that case, or someone in that case, testify to him having epilepsy? The wife, I believe, testified in Grant. If we're going to write this case the way you want us to write it, could everyone who ever killed somebody say they had an epileptic seizure? No, not at all. And I would point to Nelson, which that argument was made. Could every person with Tourette's Syndrome get out of the crime by saying they have Tourette's? And the court said, no, obviously not. You look at the facts and circumstances of the case. And here, even Dr. Schilling... Why don't they all hire a doctor, and the doctor will come in and say that they had an epileptic seizure. This is the chief epileptologist at Northwestern Hospital. The world will be having epileptic seizures every time they do something bad. This is the chief epileptologist of Northwestern who reviewed thousands of pages of medical records, I think 10 years worth of medical history showing this. Did he, in those records, is there a report of his conversations with the defendant about her recollection, or did she simply tell the doctor, I can't remember anything that happened that day? The latter, yes. She does not remember what happened that day according to what she tells the doctor. Okay, and then was there anyone anyone that he interviewed that actually testified that on the date of this shooting that she was suffering from a seizure? Not suffering from a seizure. She was in the post-ictus psychosis. Okay, who did he talk to or was that just his opinion? No, no. Her family members and her boyfriend, Mr. Biggs, described her in the author of proof. Not that day. There's no testimony from anyone about that day. There's testimony about a couple of days before him. There's testimony for the entire three-day period from June 28th to July 2nd about her being in and out of the hospital, in and out of an ambulance. She's disoriented. She's confused. She can't recognize her family, doesn't know who they are. Hours before the incident, she leaves her boyfriend, Mr. Biggs, and that's when she's found on the bus stop acting irrationally bizarrely. And there's witness testimony that she is at the bus stop for probably four hours acting, you know, irrationally bizarrely before this shooting takes place. So there's ample evidence in the author of proof and a little bit of trial to support this notion. All right. Thank you, Mr. Kropas. Thank you. Ms. O'Grady-Kroniak. Good morning, Your Honors. Again, my name is Assistant State's Attorney Sheila O'Grady-Kroniak and I'm here on behalf of the people of the state of Illinois. What standard of review do you think that we should apply for the judges? This is a classic abuse of discretion case. The trial court reviewed the evidence and determined that it was not admissible in this case. Although a defendant does have a constitutional right to present a defense, that is still subject to the rules of evidence, the rules of admissibility, and the rules of relevance. In this case, what we have is Dr. Shul's opinion, which is, as Your Honor stated, classic insanity. He states that she is unable to appreciate what's going on and that he diagnoses her as being in a post-ictal psychosis state. He characterizes her behavior as paranoid. He characterizes her behavior as delusional, psychotic, erratic. He never states that her behavior is involuntary. He never characterizes her as unable to act volitionally. And Dr. Shul clarifies and distinguishes that a classic non-volitional movement like we had in Grant, like we had in Jackson, is a person who can't make an intentional motor action. He says that's not what we have here. Shul himself undermines defendant's argument that her actions were involuntary. Have you had a chance to see the videotape? I have, Your Honors. Do you agree with the defense characterization that there was a sufficient viewing ability on that videotape to make that determination? I do not. What I saw on the video and what Your Honors can see for yourselves is defendant standing on the bus. You can see defendant initiate the contact with Officer Francis. You can see defendant come off the bus to Officer Francis. From there, it's unclear because of the position of the camera. It's 2 o'clock in the morning. The lighting isn't very good. It's hard to determine what exactly is going on. Can you see the bus driver get up off the bus at some point? I believe Tracy Jackson does come off the bus to talk to Officer Francis and comes back on. We see the driver run to the back of the bus when the gunshot happens. At the end of the day though, would you agree that it really doesn't matter whether the videotape supports his interpretation or not? His opinion wasn't really necessarily based on the videotape. He said he looked at it and maybe he mischaracterized what he saw or maybe he saw something that the judge didn't see. His opinion was based on reviewing medical records. Correct. Talking to relatives. I brought up the videotape because there seems to be a major discrepancy between the state's position about what the record evidence is and the defense position about the record evidence. Your Honor, I would submit that the record speaks for itself. We will review the testimony very carefully and certainly already have quite a summary of it. What is your understanding of diminished capacity? Diminished capacity comes directly from Hewlett. In Hewlett it states that diminished capacity allows a defendant to offer evidence of her mental condition in relation to her capacity to form mens rea or the intent required for the charge defense. Hewlett goes on to state this is no longer admissible in Illinois. In 1995 the legislature amended the insanity statute and the inability to conform their conduct was removed as a valid affirmative defense. The fact that the insanity statute changed also undermines the relevance of Grant in this case because Grant was decided in 1973. In Grant it absolutely does not establish that every epileptic seizure automatically exonerates conduct. Notably, the defendant in Grant's conviction was affirmed. In Grant the epilepsy was submitted under the insanity defense and the jury rejected it. And the appellate court said and the Supreme Court said that's fine in this case. Would you say that if you looked at the pre-1995 statute and compared the language prior to its amendment that Dr. Shules basically his testimony was in effect the 1995 statute regarding insanity? Yes, absolutely. Dr. Shules' testimony is clearly establishing only diminished capacity. When it is not insanity, it's not automatism, it's diminished capacity, it's not admissible at that point. We have rejected that as a defense in Illinois. Why isn't this automatism? I think I'm saying that right. I don't know.  we say it, but why isn't it this case? I mean there's some testimony isn't there? There's a suggestion that he was I'm sorry, she was having a post-ictal Well, a post-ictal psychosis according to Dr. Shules himself, the post-ictal psychosis, you can walk and function to a certain degree at page 59 of his testimony. You can walk and function to a certain degree, but you have psychotic symptoms. They're irrational or erratic or bizarre behavior. And he states at 75, I cannot exclude that during those three days, she would have had the intention to go to the bathroom, or she had the intention to eat something, or do something intentional. And then he explains that what she has in this case is not involuntary automatism conduct. What she has is, he calls it a self-preservation instinct, which can make her do things which are quite directed to defend herself. What she has is this paranoid delusion that she has to defend herself. That is not automatism. That is diminished capacity. Can a doctor that's a specialist in epilepsy give an opinion about a psychiatric disorder? Well, Ron, in this case, he did. And that's what we're left with. And that's what the trial court was left with. And the trial court was not given any valid avenue to bring this diminished capacity defense before the jury because we know, per Hewitt, that it is not acceptable in Illinois. Do you recall any portion of his testimony when he was asked about whether you can determine whether someone's acting erratically or irrationally? I do recall he says, versus pulling a trigger, firing a weapon in someone's direction. Did he say something like, well, you could be able to do that yourself? That's not something I would be able to say. What he precisely said is I think you're as good a judge of erratic behavior as I am. So isn't he like the doctor in Hewitt? Exactly, Your Honor. That is the state's position in this case, is that this case is legally analogous to Hewitt. In Hewitt, it was post-partum psychosis that the defendant was using to attack the mens rea. In this case, it's post-ictal psychosis that's being used to attack the mens rea. Which, again, is distinguishable from Nelson with the Tourette's, where, yes, it was a complicated behavior, but that was in that case, which is a crucial distinction that the court can make in this case. What about your opponent's claim that really what you're attacking is the weight of the evidence, not its admissibility, that the jury should have heard this evidence, and that the complaint you have is really weight, not admissibility? Well, Your Honor, my position is that this evidence, as it stands, as Dr. Shuley's opinion stands, is completely inadmissible, and cannot go before the jury. Because of what? It's diminished capacity. Because it amounts to diminished capacity. It represents what the previous statute described as insanity. Exactly, Your Honor. Pre-1995. Yes. Do you have any cases that say that? That say that the... That the... What was presented here is truly diminished capacity, which was rejected by the legislature in 1995 when they amended the insanity statute. Your Honor, that is precisely what Hewlett says. That the postpartum psychosis is no longer admissible after the 90...or no longer admissible for insanity because it amounts to diminished capacity after the 1995 amendment. At the end of the Hewlett opinion, the justices discuss that it's no longer a valid defense in Illinois. Well, I don't think counsel is really suggesting that diminished capacity is admissible. What he's arguing is that this was not evidence of diminished capacity. It was evidence that she could not act voluntarily. Well, Your Honor, that's one interpretation of Dr. Shuley's testimony that is not...simply not borne out by the record of his actual testimony and his actual opinion. He never states that she's unable to act voluntarily. What he states is that she's unable to appreciate the consequences of her actions, which is squarely falling under diminished capacity. Very briefly, would you agree that the description of the evidence in this case is quite different from your brief versus their brief? I would submit, Your Honor, that I carefully reviewed the trial record and the record in this case and presented the facts as I best understood them. I have Robert Burke's testimony. I know that there was some confusion about that. Well, I'm not really talking so much about the testimony regarding gunshot residue. Yes, exactly. But the eyewitness testimony, you suggest that a police witness and then I think two other civilian witnesses, one woman was in a car. Yes, the veterinarian. And she testified and then there was one other person. As far as I know, Your Honor, it was just Officer Gauthier and Dr. Oisey. Okay. And basically they said that they observed what appears to be a struggle. Yes. And then the struggle ended. Yes. And Officer Francis is left defenseless and helpless on the street as defendant then basically executes him by shooting him point blank in the face. Well, did they say they didn't really see the weapon being fired? What I gleaned from their testimony is that they saw her fire directly into Officer Francis' face while he was on his knees with his palms open on either side of his face. Any struggle that had occurred, obviously some struggle occurred. Well, did multiple witnesses testify that they observed her firing the gun in the direction of other officers that were behind it? Yes. Is there any dispute about that? No, Your Honor. There's no challenge to defendant's conviction for aggravated discharge and there is no challenge to defendant's conviction of disarming a peace officer. No, but is there any difference in the briefs as far as, you know, that there were witnesses who testified that she crouched behind a squad car and fired the gun in the direction of other officers responding to the scene? Yes, and then crawled under the car. Yes, I believe that everyone's in agreement on that point and that counsel and I disagree as to how exactly the struggle happened and how exactly Officer Francis was murdered. If there are no further questions, then for those reasons and those stated in our brief, we ask that you affirm defendant's convictions in sentence. Thank you. Thank you, Mr. Kropach. Mr. Kropach? Thank you, Your Honors. The issue of I can see that the issue of insanity and diminished capacity comes up in this case. The point is that voluntariness and the burden to prove your mental state, those concepts predate and post-date any changes to the insanity statute predate and post-date the diminished capacity case. What's at issue here is voluntariness and the state's burden to prove the mental state and that's an issue that should have been decided by the jury not by the judge in a pretrial hearing and to go back to Jackson again, I think that's such an important case and I think the only real distinction between Jackson and Jackson  was a victim of a gun. You had a person with a mental health crisis of some sort being restrained by an officer who lashes out. There's evidence of an epileptic seizure. Here we have expert testimony. The testimony in Jackson was different, though. Even the so-called victim, the paramedic, said that he didn't think the defendant intended to strike him and didn't intend any of his actions. We don't have that here. We have that with Dr. Shul. I'm talking about the witnesses and the victims who were actually there. Nobody has testified that she was not in control of herself. All you have is a doctor who wasn't present, never saw her before the incident, just saw her afterward. The analogy to Jackson is not well-founded, counsel. One other point about Jackson. Later in the opinion, Jackson states plainly that it's improper to have a lay opinion on the absence of a seizure. And for the court to decide, based on the video and whatever lay witness observations, that Robin was not having a seizure at the time plainly violates what this court said in Jackson. Well, there wasn't anyone that said she wasn't having a seizure. No one said she wasn't having a seizure. The problem was that the doctor, he kind of went back and forth. He said, I can't really say when she was acting voluntarily or not. Didn't he say that? No, he did not. Did he say, I can't tell you whether when she fired the gun or whether when someone fires a gun that they're acting voluntarily or not. That's something you can decide for yourself. What he says, he maintains that she is in a post-ictal psychosis during this entire incident, during the struggle with Francis, and even afterwards. You can look to page Triple T 101. Even after, when she's firing in the direction of other officers, she remains in this post-ictal state. This was a struggle that from my view... But he didn't base that on anything he saw, did he? The videotape doesn't show any of that. The videotape shows a struggle that from the time... The videotape doesn't show the shooting in the direction of the first shot against Officer Francis. He maintains that during this entire episode, she is in this post-ictal psychosis. And it's important to remember that this incident, from my count, is about 28 seconds long. From the time that Robin gets off the bus until the time the officers come to restrain her. This happens extremely quickly. Does a trial court have authority under the law to make a decision regarding whether or not testimony will serve to confuse a jury? And or that the testimony is speculative? Does a court have the ability to say, I'm not letting this go to the jury. The testimony is confusing. It doesn't have any... Of course. What the court cannot do is arbitrarily reject the opinion of the expert. And I think we've cited a case for that, Kando, for that proposition, which was an insanity case, where the trial court, based on his own sort of lay observations, lay view of the evidence, rejected the expert testimony. Let me ask you this one other question. If the court is correct, or the trial judge is correct, when it concluded that what the defendant was trying to do was present evidence of diminished capacity, would you agree that that was a valid call? If this were a diminished capacity defense, then yes, under Illinois law, the court is fine to bar that. Your position is it wasn't evidence of diminished capacity. Correct. Right. But you would agree that if the court actually made a correct call that what you were trying to do, not you, but the defense attorney when he tried the case, that what was the actual defense was really one of diminished capacity, then it wouldn't be an abuse of discretion to say I'm not letting this in. If the trial court were truly correct in that regard, sure. We maintain that the court was not correct in that regard. Yes. But what she was trying to do was present absolutely valid defenses under the law. Would you have a problem if the testimony of Dr. Shules kind of matches pre-1995 standards for insanity? But the language changed. The legislature changed the insanity defense language. They removed one prong of the insanity defense. Correct. The state's sort of arguing that the testimony of Dr. Shules is essentially pre-1995. It relies on the grant case is misplaced because it's their position, of course, that this was really a diminished capacity defense. It ties into, what I will say is that it arguably ties into the prong of insanity that was eliminated. Because it is somewhat related, and Grant acknowledges that. Grant acknowledges that the volitional prong of insanity is related to the question of theories that a defendant can pursue. Sure, but that was in 1991, and that was before the legislature changed the statute in 1995. But voluntariness remains, otherwise you wouldn't have NELSA, you wouldn't have Martina. Is voluntariness an affirmative defense? I'm sorry? Voluntariness is not an affirmative defense. The burden rests with the state. What was the defense in this case? Defense at trial? Yes. There wasn't much of a defense because it was gutted from... Okay, but I mean if you were to characterize it, if it had been permitted, how would you characterize it? Do you characterize this automatism? Yes, automatism. Yes, the state's failure to prove the elements of voluntariness or the mental state. And then a third rationale that we didn't get a chance to talk about much is that, you know, even where something does not directly go to an element, that evidence could be admissible to give context or background for an otherwise inexplicable situation. We see it with gang shootings all the time. We allow gang evidence in, even though being part of a gang isn't an element of shooting, but it gives context to what's going on. Isn't it kind of this idea about letting somebody put in a motive? Aren't you talking about two different things? No, I'm saying it's yet another reason that this should have come in, in this case. What the jury was left with was a woman acting confused and irrationally, and the state telling the jury in closing argument, correctly, that acting irrationally is not a defense. There was no defense left here. But is that an inaccurate statement of the law, that acting irrationally is not a defense? You're right, but no, that's an absolutely accurate statement of the law. And did he say she was acting irrationally and erratically and she was suffering from a postictal... Are you talking, Dr. Shule? Yes. A postictal psychosis? Yes. Yeah. So, the state took advantage of the lack of testimony about the epileptic seizure, the postictal state that she was in, saying that acting irrationally is not a defense, and saying, I think, very misleadingly, that Robin was a woman on a rampage, acting out to get anyone she could, plainly ignoring the medical condition that was at the root of what occurred here. And all we are saying, again, is that this is something that, in light of everything we've talked about, should have been hashed out at a trial, in front of the trier of fact. At which point, then we'd be able to argue the strength of this evidence or the credibility of it or the credibility of Dr. Shule's testimony. But those kind of questions are premature at this point. Thank you, Mr. Pritchett. Thank you. We'll take the matter under advisement and issue an order as soon as possible. Thank you. Court is adjourned.